# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NBC-USA HOUSING, Inc., TWENTY-SIX

    Plaintiff,

    v.

SHAUN DONOVAN, Secretary of the
Department of Housing and Urban
Development, *et al.*,

    Defendants.

Civil Action No. 09–2245 (CKK)

## MEMORANDUM OPINION
(March 31, 2011)

Plaintiff NBC-USA Housing, Inc., Twenty-Six ("NBC") filed the above-captioned action

against Defendants Shaun Donovan, as Secretary ("Secretary") of the Department of Housing

and Urban Development ("HUD"),[1] Jim Hotard Properties, LLC ("Hotard"), and Roy S. Lilley in

his capacity as a HUD foreclosure commissioner ("Lilley") for declaratory and injunctive relief

relating to Defendants' actions in foreclosing on a property owned by NBC called "Fortner

Manor." In its four-count Complaint, NBC contends that Defendants failed to comply with HUD

regulations in refusing to delay or withdraw foreclosure, denied NBC notice and an opportunity

to be heard regarding the foreclosure, and otherwise acted arbitrarily and capriciously in deciding

to foreclose. On September 27, 2010, the Court granted Defendant Hotard's motion to dismiss

for lack of personal jurisdiction and dismissed Hotard from this action. *See* [35] Order (Sept. 27,

2010). The Secretary and Lilley (collectively, "Federal Defendants") have filed a [21] Motion to

---

[1] The Court shall use the term "Secretary" and "HUD" interchangeably throughout this
Memorandum Opinion.

Dismiss the Complaint, or, Alternatively for Summary Judgment in which they seek to dismiss Lilley as a defendant for lack of personal jurisdiction and seek dismissal or summary judgment as to all of NBC's claims. NBC has filed an opposition, in which it requests jurisdictional discovery, and Federal Defendants have filed a reply. The motion is therefore ripe for adjudication.[16] Although Federal Defendants move only in the alternative for summary judgment on the merits of NBC's claims, the Court finds that, except for two narrow claims discussed below, the parties have presented materials outside the pleadings for the Court's consideration.[17] Therefore, the Court shall treat Federal Defendants' motion primarily as one for summary judgment.

For the reasons set forth below, the Court shall (1) deny NBC's construed motion for jurisdictional discovery; (2) grant Federal Defendants' motion to dismiss Lilley as a defendant for lack of personal jurisdiction; (3) grant the Secretary's motion to dismiss with respect to NBC's claims that HUD discriminated against it by foreclosing on Fortner Manor at the request of non-minority organizations and by singling NBC out for foreclosure; and (4) grant the Secretary's alternative motion for summary judgment with respect to NBC's remaining claims.

---

[16] NBC has also filed a [37] Motion for Oral Argument on the pending motion, which Federal Defendants do not oppose but believe is unnecessary. The Court finds that oral argument would not be helpful in deciding the pending motion, and therefore the Court shall DENY NBC's motion for oral argument. *See* LCvR 7(f) ("A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the court.").

[17] In support of their motion, Federal Defendants have attached a declaration from Defendant Lilley and a 118-page administrative record. NBC attached three declarations and numerous exhibits totaling over 300 pages to its opposition, and Federal Defendants attached additional declarations and exhibits totaling 96 pages to their reply.

# I. BACKGROUND

*A.    Statutory and Regulatory Background*

Section 811 of the Cranston-Gonzalez National Affordable Housing Act ("Section 811"),

42 U.S.C. § 8013, authorizes the Secretary "to provide assistance to private, nonprofit

organizations to expand the supply of supportive housing for persons with disabilities."[18]  *Id.*

§ 8013(b)(2).  HUD provides this assistance in the form of capital advances and project rental

assistance contracts.  *Id.* § 8013(b)(2)(A)-(B).  Capital advances are non-interest-bearing and do

not need to be repaid "so long as the housing remains available for very-low-income persons[[19]]

with disabilities" in accordance with Section 811.  *Id.* § 8013(d)(1).  Repayment of a capital

advance does not extinguish a recipient's obligation to maintain the housing in accordance with

Section 811.  24 C.F.R. § 891.170(a).  Project rental assistance contracts, in comparison,

"obligate the Secretary to make monthly payments to cover any part of the costs attributed to

units occupied . . . by very low-income persons with disabilities that is not met from project

income . . . ."  42 U.S.C. § 8013(d)(2).  In exchange for the capital advances and project rental

---

[18] As amended, the term "supportive housing for persons with disabilities" means dwelling units that "are designed to meet the permanent housing needs of very-low-income persons with disabilities" and "are located in housing that make available supportive services that address the individual health, mental health, or other needs of such persons."  42 U.S.C. § 8013(k)(3).  "The term 'person with disabilities' means a household composed of one or more persons who is 18 years of age or older and less than 62 years of age, and who has a disability." *Id.* § 8013(k)(2).  A person "has a disability" if, pursuant HUD regulations, the person is developmentally disabled, as defined in 42 U.S.C. § 15002(8), or is determined to have "a physical, mental, or emotional impairment which (A) is expected to be of long-continued and indefinite duration, (B) substantially impedes his or her ability to live independently, and (C) is of such a nature that such ability could be improved by more suitable housing conditions."  *Id.*

[19] For purposes of Section 811, "very low-income" is defined in the same manner as 42 U.S.C. § 1437a(b)(2), which defines "very low-income families" as "families whose incomes do not exceed 50 per centum of the median family income for the area, as determined by the Secretary with adjustments for smaller and larger families."  *See id.* § 8013(k)(9).

3

assistance contracts, nonprofit organizations must operate the housing in compliance with Section 811 for at least forty years.  *See id.* § 8013(e)(1).  HUD regulations require Section 811 housing to, *inter alia*, "be decent, safe, sanitary and in good repair," including the housing site, building exterior, building systems, dwelling units, and common areas.  24 C.F.R. § 5.703.  In addition, "[t]o ensure its interest in the capital advance, HUD shall require a note and mortgage, use agreement, capital advance agreement and regulatory agreement from the Owner . . . ."  *Id.* § 891.170(a).

"[U]pon the breach of a covenant or condition in the mortgage agreement" between HUD and a Section 811 recipient, the Secretary may foreclose on the Section 811 housing in accordance with the Multifamily Mortgage Foreclosure Act of 1981 ("MMFA"), 12 U.S.C. §§ 3701-17.  *See* 12 U.S.C. § 3705.  The MMFA "create[s] a uniform Federal foreclosure remedy for multifamily mortgages." *Id.* § 3701.  Pursuant to the MMFA, the Secretary is authorized to designate a "foreclosure commissioner," who "shall be a person who is responsible, financially sound and competent to conduct the foreclosure" and, "if a natural person, shall be a resident of the State in which the security property is located."  *Id.* § 3704.

If a mortgage agreement is breached, "the Secretary may request the foreclosure commissioner to commence foreclosure of the mortgage."  *Id.* § 3707(a).  However, either "before or after the designation of the foreclosure commissioner but before service of the notice of default and foreclosure," the Secretary must provide the mortgagor "an opportunity informally to present reasons why the mortgage should not be foreclosed."  24 C.F.R. § 27.5.  After such an opportunity, the foreclosure commissioner may commence foreclosure through the service of notice of default and foreclosure sale.  12 U.S.C. § 3707; *see also id.* § 3706 (detailing

information included in a notice of default and foreclosure sale). At least twenty-one days prior to the foreclosure sale, the notice of default and foreclosure sale must be sent by certified or registered mail to: (1) "the current security property owner of record;" and (2) "the original mortgagor and all subsequent mortgagors of record or other persons who appear of record or in the mortgage agreement to be liable for part or all of the mortgage debt." *Id.* § 3708(1)(A)-(B).[20] These notices are "mailed to the owner or mortgagor at the address stated in the mortgage agreement, or, if none, to the address of the security property, or, at the discretion of the foreclosure commissioner, to any other address believed to be that of such owner or mortgagor." *Id.* § 3708(1).

The foreclosure commissioner can withdraw a property from foreclosure and cancel the foreclosure sale in only three situations. *See id.* § 3709(a). First, if the Secretary directs the foreclosure commissioner to cancel the sale. *Id.* § 3709(a)(1). Second, if the foreclosure "commissioner finds, upon application of the mortgagor at least three days prior to the date of sale, that the default or defaults upon which the foreclosure is based did not exist at the time of service of the notice of default and foreclosure sale." *Id.* § 3709(a)(2). Or finally, if, *inter alia*, the mortgagor tenders the entire amount due in the event of a monetary default or, in the case of a non-monetary default, the foreclosure commissioner finds, upon application of the mortgagor, that the default is cured. *See id.* § 3709(a)(3).

---

[20] The MMFA also provides that within ten days of the foreclosure sale, the notice of default and foreclosure sale must be sent to "all persons holding liens of record upon the security property." *Id.* § 3708(1)(C).

B.    *Factual Background*

1.    <u>NBC's Purchase of Fortner Manor and Agreements with HUD</u>

NBC is a non-profit religious organization that, *inter alia*, provides affordable housing to the disabled and elderly.  Compl. ¶ 1.  On September 1, 1999, NBC purchased the property currently located at 2217 Lapeyrouse Street, New Orleans, Louisiana, for approximately $100,000.  *Id.* ¶ 6.  At this site, NBC planned to build Fortner Manor Apartments ("Fortner Manor") in order to provide affordable rental housing for the elderly and disabled.  *Id.* ¶ 7.  To finance the construction of Fortner Manor, NBC, through its president Reverend Zebadee Bridges and secretary Reverend Willie Gable, entered into three agreements with HUD on September 29, 1999.  *See id.* ¶¶ 9-10; Def.'s Stmt. ¶¶ 16, 20, 24.[21]  Those agreements include: (1) a mortgage agreement and note ("Mortgage Agreement"), Compl., Ex. A; Administrative Record ("AR") at 7-12; (2) a use agreement ("Use Agreement"), Compl., Ex. B; AR at 20-23; and (3) a

_____

[21] The Court strictly adheres to the text of Local Civil Rule 7(h) when resolving motions for summary judgment.  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case).  The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [25] Order (Apr. 16, 2010) at 3-4.  The Court has also advised the parties that "[a]t all points, [they] must furnish precise citations to the portions of the record on which they rely."  *Id.* at 4; *see also Burke*, 286 F.3d at 518 ("[A] district court judge should not be obligated to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)) (internal quotation marks omitted).  Therefore, in most instances the Court shall cite only to Federal Defendants' Statement of Material Facts Not in Genuine Dispute ("Defs.' Stmt."), unless a statement is contradicted by NBC, in which case the Court may cite NBC's Response to Defendants' Statement of Material Facts Not in Genuine Dispute and Statement of Disputed Material Facts ("Response" or "Resp.").  The Court shall also cite directly to evidence in the record, where appropriate.

The Court notes that along with its Response, NBC filed 114 pages of documents to which NBC does not cite and which appear to be unrelated to this case and possibly filed by mistake.  *See* Docket No. [28-4] at 43-156.  Accordingly, the Court shall not reference these materials in resolving the pending motions.

regulatory agreement ("Regulatory Agreement"), AR at 13-19.  Subsequently, on September 10, 2001, NBC's new president, Reverend Charles W. Noble, executed NBC's project rental assistance contract ("PRAC") with HUD.  Defs.' Stmt. ¶¶ 31, 36.  The relevant portions of the Mortgage Agreement, Regulatory Agreement, and PRAC—the agreements at issue in the pending motions—are set forth below.

a.      The Mortgage Agreement

The Mortgage Agreement provides that in exchange for HUD's capital advance of $1,535,700.00, NBC grants the Secretary a security interest in Fortner Manor.  Defs.' Stmt. ¶ 16; AR at 7-12.  The Agreement also incorporates the Regulatory Agreement's provisions and provides that upon default of the Regulatory Agreement, the Secretary "may declare the whole indebtedness secured to be due and payable."  Defs.' Stmt. ¶ 17; AR at 7.  In the Agreement, NBC promises to keep Fortner Manor "in good repair, and not to do, or permit to be done, upon said premises, anything that may impair the value thereof "  Defs.' Stmt. ¶ 18; AR at 8.  The Agreement further provides that "in case of a breach of any [] covenant," the entire principal—$1,535,700.00— shall become due at the Secretary's election, and the Secretary "shall have the right immediately to foreclose this Mortgage."  Defs.' Stmt. ¶ 19; AR at 9.

b.      The Regulatory Agreement

The Regulatory Agreement provides that "[t]he Note and Mortgage bear no interest and repayment is not required so long as the housing remains available for . . . very low-income persons with disabilities . . . ."  Defs.' Stmt. ¶ 25; AR at 13.  The Agreement provides that NBC "shall maintain the mortgaged premises, accommodations and grounds and equipment

appurtenant thereto, in good and substantial repair and condition . . . ." Defs.' Stmt. ¶ 26; AR at

14. Paragraph 15 states that:

> Upon a violation of any of the above provisions of this Agreement by Mortgagor,
> HUD may give written notice, thereof, to Mortgagor, by registered or certified mail,
> addressed to the address stated in this Agreement, or such other address as may
> subsequently, upon written notice thereof to HUD, be designated by the Mortgagor
> as its legal business address.

Defs.' Stmt. ¶ 28; AR at 16. In addition, "[i]f such violation is not corrected to the satisfaction of

HUD within 30 days after the date such notice is mailed or within such further time as HUD

determines is necessary to correct the violation, without further notice HUD may declare a

Default under this Agreement . . . ." Defs.' Stmt. ¶ 28; AR at 16. Finally, the Regulatory

Agreement incorporates by reference the PRAC and provides that a violation of the PRAC "may

be construed to constitute a default hereunder in the sole discretion of HUD." Defs.' Stmt. ¶¶ 29-

30; AR at 16.

### c. The PRAC

The purpose of the PRAC "is to provide project rental assistance payments on behalf of

Eligible Families leasing decent, safe and sanitary units from the Owner." Defs.' Stmt. ¶ 32; AR

at 24. In paragraph 2.5(a), NBC agrees "to maintain and operate the Contract Units and related

facilities to provide decent, safe, and sanitary housing . . . ." Defs.' Stmt. ¶ 38; AR at 29. "If

HUD notifies the Owner that it has failed to maintain a dwelling unit in decent, safe, and sanitary

condition and the Owner fails to take corrective action within the time prescribed in the notice,

HUD may exercise any of its rights or remedies under [the PRAC] . . . ." Defs.' Stmt. ¶ 42; AR

at 29. Paragraph 2.13 provides that:

> If the Project is located in an area that has been identified by the Director of the
> Federal Emergency Management Agency ["FEMA"] as an area having special flood

hazards and if the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, the Owner agrees that it will obtain coverage of the Project, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project costs (less estimated land costs) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1986, whichever is less.

Defs.' Stmt. ¶ 40; AR at 32. A default of the PRAC occurs when NBC: (1) violates or fails to comply with the PRAC, "including failure to correct any deficiencies identified by HUD in connection with any annual or other inspection;" (2) "assert[s] or demonstrate[s] an intention not to perform some or all of its obligations under" the PRAC; or (3) violates or fails to comply with Section 811, the Mortgage Agreement, or the Regulatory Agreement. Defs.' Stmt. ¶ 43; AR at 33. Once HUD determines that a default has occurred, the PRAC provides that NBC shall be notified of the nature of the default; the actions and remedies required to cure default; and the time in which it has to cure default. Defs.' Stmt. ¶ 44; AR at 33.[22]

        2.        <u>Hurricane Katrina, Fortner Manor's Damages, and NBC's Repair and Funding Plans</u>

In August 2005, Hurricane Katrina struck New Orleans and caused extensive damage to Fortner Manor, rendering the complex uninhabitable. Compl. ¶¶ 13, 19. All of Fortner Manor's residents were evacuated during the hurricane and none were injured. *Id.* ¶ 18. Since Hurricane

---

[22] The Use Agreement, although not at issue in this pending motion, provides that "in exchange for HUD's agreement to provide capital advance financing and project rental assistance payments, [NBC] has agreed to continue to operate [Fortner Manor] only as rental housing for very-low income elderly or disabled persons for not less than 40 years from July 1, 2000, unless otherwise provided by HUD." Defs.' Stmt. ¶ 22; AR at 20. "In the event of a breach or threatened breach of any of the provisions of this [Use] Agreement, any eligible tenant or application for occupancy, or the Secretary or his or her successors or delegates, may institute proper legal action to enforce performance of such provisions, to enjoin any acts in violation of such provisions, to recover whatever damages can be proven, and/or to obtain whatever other relief may be appropriate." Defs.' Stmt. ¶ 23; AR at 21.

Katrina, and at least until the parties' briefing on the pending motions, Fortner Manor has remained vacant, uninhabitable, and inoperable. Defs.' Stmt. ¶ 47.

Although the parties disagree as to what occurred with respect to Fortner Manor in the immediate aftermath of Hurricane Katrina, they agree that on April 28, 2006, NBC and HUD representatives met at HUD's Forth Worth, Texas office. Defs.' Stmt. ¶ 51. The parties also agree that on August 1, 2006, HUD authorized the payment of $15,000 from Fortner Manor's reserve fund[23] to pay for, *inter alia*, packing and storing of all salvageable items from Fortner Manor, removal of all refrigerators, and gutting and cleaning of the entire first floor and four additional units on the second and third floors. Defs.' Stmt. ¶ 52; AR at 35-38 (Letter from Ann C. Kizzier, Dir., La. Multifamily Program Cntr., to Kodozo Agbenyah, Taliafaro, Inc. (Aug. 1, 2006)).

On August 31, 2006, HUD representatives and Reverend Gable met at HUD's New Orleans office. Defs.' Stmt. ¶ 55. During this meeting, the parties discussed the fact that Fortner Manor was not covered by flood insurance, and that NBC was seeking financing to repair Fortner Manor because it currently lacked the funds to do so. *Id.*[24]

After Hurricane Katrina, HUD requested that owners and managers of properties that were affected by the hurricane provide HUD with plans for how their properties could be restored

---

[23] A reserve fund "is generally used to help defray the costs of replacing a project's capital items. However, following Hurricanes Katrina and Rita, HUD has permitted the use of reserves to make necessary repairs pursuant to Department Policies and Handbooks." AR at 47 (Letter from Cherlyn Wheeler, Asset Mgmt. Branch Chief, La. Mutlifamily Program Ctr., HUD, to Keith Key, President & CEO, KBK (Apr. 26, 2007)).

[24] NBC claims that it informed HUD during the August 31, 2006 meeting that it did not have the funds necessary to repair Fortner Manor *and* Raphael Manor, which is another of NBC's properties damaged by Hurricane Katrina. Pl.'s Resp. ¶ 55.

and therefore regain compliance with applicable regulations and agreements.  *See* Defs.' Reply, Decl. of Anita Hamm ("Hamm Decl.") ¶ 8.[25]  On October 16, 2006, HUD's New Orleans office received a letter from KBK Enterprises ("KBK"), a developer hired by NBC to rebuild Fortner Manor, requesting that HUD remove Fortner Manor's PRAC and allow NBC to refinance Fortner Manor in order to facilitate its restoration.  Defs.' Stmt. ¶ 56; AR at 40-41 (Letter from Keith Key, President & CEO, KBK, to Art Wells, Production Branch Chief, New Orleans Field Office, HUD (Sept. 27, 2006)).  HUD responded to KBK's request on November 1, 2006, informing KBK that its New Orleans field office was not authorized to remove the PRAC and that, pursuant to 24 C.F.R. § 891.170, repayment of NBC's capital advance would not extinguish NBC's obligation to maintain Fortner Manor as Section 811 housing.  Defs.' Stmt. ¶ 57; AR at 42 (Letter from Cherlyn Wheeler, Asset Mgmt. Branch Chief, New Orleans Field Office, HUD, to Keith Key, President & CEO, KBK (Nov. 1, 2006)).

KBK once again contacted HUD's New Orleans office on February 16, 2007, this time with NBC's "official proposal" to redevelop Fortner Manor.  AR at 44 (Letter from Keith Key, President & CEO, KBK, to Anita Hamm, Project Manager, New Orleans Field Office, HUD (Feb. 26, 2007)).  In this proposal, KBK informed HUD that Fortner Manor's estimated cost of repair would be $500,000 and detailed NBC's efforts to obtain funding to meet this cost.  *Id.* KBK also requested HUD's "approval to use the remainder of the reserve fund to complete specific predevelopment efforts," and requested a twelve-month forbearance on Fortner Manor so

_____

[25] Anita Hamm, project manager in HUD's Louisiana Multifamily Program Center, declares that NBC was informed of this requirement around May 3, 2006.  *See* Hamm Decl. ¶ 8. The letter supposedly informing NBC of this requirement is not part of the administrative record and "has been unintentionally misplaced and [HUD] ha[s] not been able to locate it."  *Id.*  In light of the foregoing, the Court does not rely on this fact but merely states it here to explain why NBC and its affiliates began submitting proposals to HUD.

it could have time to make Fortner Manor operational. *Id.* at 44-45; Defs.' Stmt. ¶ 61. HUD

responded on April 26, 2007, noting its frustration that Fortner Manor's restoration had not

progressed: "Because a substantial amount of time has elapsed, our expectation was that by April

1st of this year, sufficient progress would have been made toward the redevelopment of these

properties to warrant a meeting and discussion with HUD." Defs.' Stmt. ¶ 61; AR at 46 (Letter

from Cherlyn Wheeler, Asset Mgmt. Branch Chief, La. Mutlifamily Program Ctr., HUD, to

Keith Key, President & CEO, KBK (Apr. 26, 2007)). HUD then informed KBK that it must

provide the following documents and information to HUD by May 15, 2007: (1) cost estimates

from insurance companies or general contractors detailing Fortner Manor's repair costs; (2)

architectural and engineering reports; (3) documentation supporting NBC's applications for

HOME funds,[26] FEMA funds, and a loan from the U.S. Small Business Administration ("SBA");

(4) documentation regarding other donated funds and other efforts to obtain funds; and (5) a

separate request for use of reserve funds detailing the amount in the account and a description of

the work to be done. Defs. Stmt. ¶ 61; AR at 46-47. HUD then denied KBK's requests to access

the balance of Fortner Manor's reserve fund because KBK's request did not satisfy the criterion

for the use of such funds. AR at 47. Finally, HUD denied KBK's request for a twelve-month

forbearance but granted NBC a three-month forbearance—the maximum forbearance HUD could

grant at one time. *See id.*

---

[26] HOME funds are allocated by HUD "among eligible State and local governments to strengthen public-private partnerships and to expand the supply of decent, safe, sanitary, and affordable housing, with primary attention to rental housing, for very low-income and low-income families." 24 C.F.R. § 92.1. "State and local governments . . . may use HOME funds to carry out multi-year housing strategies through acquisition, rehabilitation, and new construction of housing, and tenant-based rental assistance." *Id.*

On May 21, 2007, HUD officials met with Reverend Frank Centrallo, an NBC representative, in order for Reverend Centrallo "to provide [HUD] an update of the status of a reorganization plan to revitalize" NBC's Fortner and Raphael Manors. Defs.' Stmt. ¶ 63; Pl.'s Opp'n, Decl. of Reverend Centrallo ("Centrallo Decl.") ¶ 5. During the May 21, 2007 meeting, Reverend Centrallo provided HUD with a copy of KBK's May 21, 2007 "HUD Redevelopment Status Report" (hereinafter, "KBK Plan"). Centrallo Decl. ¶ 5; *id.*, Ex. A (KBK Plan).[27] The KBK Plan is KBK's response to HUD's "request for supporting documentation and status update" regarding Fortner and Raphael Manors. Centrallo Decl., Ex. A (KBK Plan) at 5. In regard to Fortner Manor, the KBK Plan notes that "the limitations placed on the Fortner property due to the PRAC requirements have surely left us with no real options for realistic rehabilitation of this property through financing options." *Id.* Nonetheless, the KBK Plan "details [] the funding efforts pursued thus far for Fortner Manor . . . and our final recommendation to solve th[e] dilemma" of redeveloping Fortner Manor. *Id.* Additionally, KBK "hope[d] that [HUD's] review of the supporting documentation will provide proof of the exhausted efforts taken to secure any and all possible funding" and that the KBK Plan "will provide [HUD] information necessary to consider [KBK's] final recommendation to preserve these units." *Id.* at 6. This supporting documentation includes an accounting of Fortner Manor's sources of income, including its reserve fund and pending FEMA funds. *Id.* at 19 (Fortner Manor Sources and Use Table (as of May 21, 2007)). In addition, the KBK Plan lists six different construction cost estimates for Fortner Manor, *id.* at 31, and purports to include the documentation submitted by

---

[27] According to Ms. Hamm, the KBK Plan was omitted from the administrative record due to "an unintentional oversight." Defs.'s Reply, Hamm Decl. ¶ 18. Given that NBC provided the KBK Plan along with its opposition, Centrallo Decl., Ex. A, the Court perceives no prejudice in its consideration of the KBK Plan in resolving the pending motions.

various contractors to support these estimates, *see id.* at 31-51.  Finally, the KBK Plan provides

documentation regarding efforts to procure a SBA loan, *id.* at 62-68, FEMA funds, *id.* at 70-80,

and HOME funds, *id.* at 82-83, for Fortner Manor.  However, "due to the absence of available

funds," KBK was unable to provide HUD with the requested architectural and engineering

reports for Fortner Manor.  *Id.* at 6.

        3.    <u>Violation Notices</u>

During the May 21, 2007 meeting, Reverend Centrallo also promised HUD that NBC

would secure the building and area surrounding Fortner Manor within the near future.  Defs.'

Stmt. ¶ 63.  Towards that end, on June 6, 2007, HUD released, at NBC's request, an additional

$6,830.00 from Fortner Manor's reserve fund "for boarding of [the] building and a 12-month

lawn service account."  Defs.' Stmt. ¶ 65; AR at 48-49 (Letter from Cherlyn Wheeler, Asset

Mgmt. Branch Chief, La. Mutlifamily Program Ctr., HUD, to Rosalind Swinger, Taliafaro, Inc.

(June 6, 2007)).  When HUD inspected Fortner Manor on July 12, 2007, however, it discovered

that the first and second floors of Fortner Manor were severely damaged, the building's electrical

and mechanical systems were damaged, and there was debris and high grass around the property.

Defs. Stmt. ¶ 66; AR at 51-52.

Consequently, on August 7, 2007, HUD sent NBC a "Notice of Regulatory Agreement

Violation" (hereinafter, "August 2007 Violation Notice"), informing NBC that it was in violation

of its obligations—under paragraph 8 of the Regulatory Agreement and 24 C.F.R. § 5.703—to

maintain Fortner Manor in good repair and condition.  Defs.' Stmt. ¶ 67; AR at 51-54 (August

2007 Violation Notice.  HUD then informed NBC that within thirty days it must: (1) remove

debris, cut the grass, and secure the building at Fortner Manor; (2) conduct a survey identifying

the physical deficiencies in the project; (3) submit an acceptable plan to correct Fortner Manor's physical deficiencies; and (4) provide the completed survey, along with an executed certification that the above work had been completed, to HUD's New Orleans office. AR at 51. HUD warned NBC that it would reinspect Fortner Manor to confirm compliance with the Regulatory Agreement and that:

> If the owner fails to take the necessary corrective action, then the Secretary may, without further notice, declare the owner in default of the Regulatory Agreement and seek any and all available remedies, including but not limited to, acceleration of the outstanding principal indebtedness, foreclosure or any other appropriate remedies.

*Id.* at 52. NBC failed to take the requested corrective actions within the time requested. Defs.' Stmt. ¶ 68.

Consequently, nearly three months later, on November 3, 2007, HUD sent Reverend Centrallo another "Notice of Regulatory Agreement Violation" (hereinafter, "November 2007 Violation Notice") regarding Fortner Manor. Defs.' Stmt. ¶ 68; AR at 55-56 (November 2007 Violation Notice). In the notice, HUD informed NBC that it would no longer hold Fortner Manor's PRAC in forbearance. AR at 55. Additionally, HUD informed NBC that, despite having two years to return Fortner Manor to "good repair and condition," Fortner Manor "has not become habitable" and NBC has not "provided an acceptable immediate plan to return the property to a habitable condition." Defs.' Stmt. ¶ 69; AR at 55. As a result, HUD ordered NBC to, within the next thirty days, submit "an immediate plan to bring [Fortner Manor] within good repair and condition within 90 days of submittal." Defs.' Stmt. ¶ 69; AR at 55. HUD once again cited 24 C.F.R. § 5.703 for the appropriate standard for good repair and condition Fortner Manor must meet. Defs.' Stmt. ¶ 69; AR at 55. HUD further advised NBC, just as in the August 2007 Violation Notice, that:

If the owner fails to take the necessary corrective action, then the Secretary may, without further notice, declare the owner in default of the Regulatory Agreement and seek any and all available remedies, including but not limited to, acceleration of the outstanding principal indebtedness, foreclosure or any other appropriate remedies.

Defs.' Stmt. ¶ 69; AR at 56.

### 4. Default Notices

On December 13, 2007, HUD once again inspected Fortner Manor and concluded that the property "remain[ed] uninhabitable due to substandard conditions." Defs.' Stmt. ¶ 71; AR at 57. Accordingly, on March 5, 2008, HUD sent Reverend Centrallo a "Notice of Default of the Project Rental Assistance Contract" (hereinafter, "March 2008 Default Notice"). Defs.' Stmt. ¶ 72; AR at 57. The March 2008 Default Notice stated that, despite the August 2007 and November 2007 Violation Notices, NBC had "fail[ed] to maintain Fortner Manor in a decent, safe and sanitary condition in accordance with 24 C.F.R. § 5.703." Defs.' Stmt. ¶ 72; AR at 57. For these reasons, the notice informed NBC that the Secretary had found it "to be in default of the Regulatory Agreement and the PRAC" and that "HUD shall pursue any and all remedies available to it without further notice." AR at 58.[28]

On December 18, 2008, HUD again informed NBC by letter (hereinafter, "December 2008 Default Notice") that it was in default of the Regulatory Agreement and that it was now in a "monetary default" under the Mortgage Agreement because it "failed to make monthly payments

_____

[28] After the March 2008 Notice, on April 11, 2008, NBC's chairman, Reverend Noble, informed HUD that "NBC encountered administrative difficulties resulting from inappropriate representations by firms claimed [sic] to have been representing NBC." Defs.' Stmt. ¶ 73; AR at 59-60 (Letter from Reverend Noble, Chairman, NBC, to Michael Backman, Dir., New Orleans Mulitfamily Hub (Apr. 11, 2008)). Consequently, NBC "reorganized itself," retained Consoc Housing Consultants ("Consoc") as its "sole housing consultant and owner representative," and instructed HUD that "no other owner's representatives or consultant (the retained management agent excepted) is authorized to represent projects sponsored/controlled by NBC in your jurisdiction." Defs.' Stmt. ¶ 73; AR at 59.

and failed to maintain and operate the property in a decent, safe and sanitary manner." Defs.' Stmt. ¶ 74; AR at 61-62 (December 2008 Default Notice). On account of these defaults and NBC's "failure to submit an acceptable reinstatement plan, HUD declare[d] the entire unpaid principal balance due and payable." Defs.' Stmt. ¶ 74; AR at 61. The December 2008 Default Notice also provided:

> Before instituting foreclosure proceedings, however, HUD will provide you with an opportunity to show reasons why foreclosure should not take place. If you believe that no default exists, or if you know of some other legal reason that HUD should not foreclose, these reasons should be submitted, in writing, within twenty-one (21) days of the receipt of this letter.

Defs.' Stmt. ¶ 74; AR at 61. Additionally, HUD informed NBC that a meeting could be scheduled to hear its appeal provided that NBC called or faxed a request for a meeting within seven days of receipt of the Notice. Defs.' Stmt. ¶ 74; AR at 62. On January 12, 2009, Reverend Noble responded to the December 2008 Default Notice, arguing that HUD's "policies and procedures regarding foreclosure actions" did not anticipate a natural disaster the magnitude of Hurricane Katrina, and accordingly "special measures are warranted" with respect to Fortner Manor. Pl.'s Opp'n, Decl. of Reverend Willie Gable ("Gable Decl."), Ex. H at 1 (Letter from Reverend Noble, Chairman, NBC, to Shaun Donovan, Sec'y, HUD (Jan. 12, 2009)).[29] The letter then detailed NBC's efforts to restore Fortner Manor, including meeting with HUD and attempting to procure funding. *See id.* at 1-3. Reverend Noble's January 12, 2009 letter also

---

[29] On January 5, 2009, Consoc apparently sent a letter to HUD indicating that it would call later that day to arrange a meeting in response to the December 2008 Notice. *See* Gable Decl., Ex. I (Letter from Bob Nance, Consoc, to Ruth Pompa, Dir., Fort Worth Multifamily Property Disposition Ctr., HUD (Jan. 5, 2009)). There is no other indication in the record that such a call was made or that a meeting resulted.

indicated, however, that NBC still had not obtained the funding necessary to repair Fortner Manor. *See id.*

On April 29, 2009, Dr. Robert Turner, Sr., president of First District Missionary Baptist Association ("FDMBA"), informed HUD that: (1) he was in receipt of the December 2008 Default Notice; (2) the FDMBA "is the local sponsor of" Fortner Manor; and (3) HUD's previous correspondences regarding Fortner Manor "did not include notice to the local sponsor." Defs.' Stmt. ¶ 77; AR at 64-65 (Letter from Dr. Robert Turner, Sr., President, FDMBA, to Ruth Pompa, Dir., Fort Worth Multifamily Property Disposition Ctr., HUD (Apr. 29, 2009)). Dr. Turner then requested a written update of the current status of Fortner Manor's foreclosure and advised HUD that FEMA was still working to provide NBC funding to repair Fortner Manor. AR at 64. By a letter dated May 5, 2009, HUD responded to Dr. Turner, advising him that "[n]otice of pending foreclosure was given to the owner of record" and that "[s]ince we have no legal reasons to stop foreclosure," HUD was proceeding with the foreclosure of Fortner Manor. Defs.' Stmt. ¶ 78; AR at 66-67.

5.    Appointment of Lilley as Foreclosure Commissioner and Notices of Foreclosure Sales

Jack T. Stark, Deputy Regional Counsel of HUD's Regional Counsel for the Southwest, appointed Roy S. Lilley as Fortner Manor's foreclosure commissioner on May 20, 2009. Defs.' Stmt. ¶ 79. On May 29, 2009, Lilley issued a "Notice of Default and Foreclosure Sale" of Fortner Manor (hereinafter, "May 2009 Notice of Foreclosure Sale"), which scheduled Fortner Manor's foreclosure sale for July 8, 2009. Defs.' Stmt. ¶ 80; AR at 79-80 (May 2009 Notice of Foreclosure Sale). On May 31, 2009, Lilley notified NBC of the July 8, 2009 foreclosure sale. Defs.' Stmt. ¶ 82.

While Lilley completed the aforementioned tasks, the Secretary received a letter from U.S. Senator Mary L. Landrieu on NBC's behalf, in which the Senator requested that HUD "consider whether an extension [of Fortner Manor's foreclosure] is warranted." Defs.' Stmt. ¶ 83; AR at 68 (Letter from Mary L. Landrieu, U.S. Senator, to Shaun Donovan, Sec'y, HUD (May 22, 2009)). On July 10, 2009, HUD responded to Senator Landrieu's letter, recounting HUD's rationale for foreclosing on Fortner Manor and indicating that, in light of Senator Landrieu's letter, HUD would postpone Fortner Manor's foreclosure for an additional twenty-one days. Defs.' Stmt. ¶ 87; AR at 69-70 (Letter from Peter Kovar, Assistant Sec'y, HUD, to Mary L. Landrieu, U.S. Senator (Jul. 10, 2009)).

Consequently, on July 9, 2009, Lilley issued another "Notice of Default and Foreclosure Sale" for Fortner Manor (hereinafter, "July 2009 Notice of Foreclosure") with a rescheduled foreclosure date of July 28, 2009. Defs.' Stmt. ¶ 84; AR at 87-89 (July 2009 Notice of Foreclosure). The same day, Lilley notified NBC of the rescheduled foreclosure sale. Defs.' Stmt. ¶ 86. On July 27, 2009, NBC's counsel, Mark Weinstein, "attempted to contact [] Lilley . . . in an effort to temporarily postpone or permanently halt foreclosure proceedings with respect to [Fortner Manor]." Pl.'s Opp'n, Decl. of Mark Weinstein ("Weinstein Decl.") ¶ 5. After not receiving "a prompt response" from Lilley on either July 27 or 28, 2009, *id.* ¶ 6, NBC filed a motion for a temporary restraining order in a Louisiana state court, Defs.' Stmt. ¶ 89; Weinstein Decl. ¶ 6; Defs.' Mot., Decl. of Roy S. Lilley ("First Lilley Decl.") ¶ 22. A hearing on the motion was held on the morning of the foreclosure sale—July 28, 2009. *See* Defs.' Stmt. ¶ 89; Weinstein Decl. ¶ 7. Lilley attended the hearing after being contacted by NBC's counsel, and

ultimately the state court judge denied NBC's motion on jurisdictional grounds. *See* Defs.' Stmt. ¶ 89; Weinstein Decl. ¶ 7.

After the hearing, Lilley continued with Fortner Manor's foreclosure sale that was scheduled for that afternoon. First Lilley Decl. ¶ 25. At the sale, Jim Hotard Properties, LLC was the highest bidder with a bid of $201,000. Defs.' Stmt. ¶ 95; First Lilley Decl. ¶ 26. Subsequently, Lapeyrouse Investments ("Lapeyrouse") obtained Hotard's interest in Fortner Manor and a closing between Lapeyrouse and HUD was scheduled for September 17, 2009. Defs.' Stmt. ¶ 93; First Lilley Decl. ¶ 27. The day before the closing, Lilley received a letter from NBC's counsel, Mr. Weinstein, advising Lilley that if HUD perfected the foreclosure and transferred Fortner Manor, NBC would bring suit seeking a declaration that the transfer was illegal. Defs.' Stmt. ¶¶ 94-95. At the closing the following day, Lilley advised Lapeyrouse and the title insurance underwriter of NBC's intention to sue if Fortner Manor was transferred. Defs.' Stmt. ¶ 96; First Lilley Decl. ¶ 29. Consequently, the underwriter refused to issue a title insurance policy and, without title insurance, Lapeyrouse was unable to obtain the loan necessary to effectuate the closing. Defs.' Stmt. ¶¶ 96-98; First Lilley Decl. ¶¶ 29-30.

With Lapeyrouse being unable to purchase Fortner Manor, HUD scheduled another foreclosure sale for November 30, 2009, and Lilley issued another "Notice of Default and Foreclosure Sale" of Fortner Manor ("October 2009 Notice of Foreclosure"). Defs.' Stmt. ¶ 99; First Lilley Decl. ¶ 31; AR at 101-102 (October 2009 Notice of Foreclosure). On October 26, 2009, Lilley notified NBC of Fortner Manor's November 30, 2009 foreclosure sale. Defs.' Stmt.

¶ 101.[30]  At this final foreclosure sale, no bids were entered for Fortner Manor.  Defs.' Stmt. ¶ 105.

As a final matter, the Court notes that Reverend Gable declares that "[a]t this point, FEMA has awarded $571, 479 to Fortner Manor.  In addition, NBC has the option of converting an award from another project to Fortner Manor in the amount of $578,826 for a total of $1,150, 305 in available proceeds to make repairs at Fortner Manor . . . ."  Gable Decl. ¶ 69.  NBC has provided no documentation to support these claims, and presumably FEMA would have provided NBC with documentation relating to an award of funds.  Without such documentation, it is unclear when FEMA allegedly granted NBC these funds and what restrictions FEMA may have placed on them.  Based solely on Reverend Gable's declaration, the Court can only assume that these funds were available as of the date of the declaration, i.e., May 5, 2010, subsequent to the events at issue.

## II.  LEGAL STANDARD

### A.    *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)*

A plaintiff bears the burden of establishing a factual basis for asserting personal jurisdiction over a defendant.  *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  "The plaintiff, however, cannot rest on bare allegations or conclusory statements and must allege specific facts connecting each defendant with the forum."  *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 36 (D.D.C. 1998); *see also Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (same).  "To make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; rather she may rest her arguments on the

---

[30] On November 4, 2009, Lilley informed NBC that the November 30, 2009 foreclosure sale's location, but not the time or date, had changed.  Defs.' Stmt. ¶ 102.

pleadings, 'bolstered by such affidavits and other written materials as [she] can otherwise obtain.' " *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005)) (alteration in original). When determining whether personal jurisdiction exists over a defendant, the Court need not treat all of a plaintiff's allegations as true. Instead, the Court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) (internal quotation marks and citation omitted). Any factual discrepancies with regard to the existence of personal jurisdiction, however, must be resolved in favor of the plaintiff. *See Crane*, 894 F.2d at 456.

B.       *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)*

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. (8)(a), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). Rather, a complaint must contain sufficient factual allegations that if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

When considering a motion to dismiss for failure to state a claim, the Court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.") (internal quotation marks omitted). However, a plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1950. When a complaint's well-pleaded facts do not enable a court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.*

In evaluating a motion to dismiss under Rule 12(b)(6), the Court is limited to considering the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). If, however, the parties present additional documents that are "not excluded by the court, the motion [to dismiss] shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(d). "All parties must be given a reasonable opportunity to present all the material that is pertinent to the [converted] motion [for summary judgment]." Fed. R. Civ. P. 12(d).

"The decision to convert a motion to dismiss into a motion for summary judgement . . . is committed to the sound discretion of the trial court." *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 at 159 (3d ed. 2004)). In exercising this discretion, a "reviewing court should not automatically treat a dismissal where external materials were not excluded as a summary judgment, although such treatment may be the most common result . . . . Rather, the reviewing court must assure itself that summary judgment treatment would be fair to both parties in that the procedural requirements of the applicable rules were observed." *Tele-Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985). However, "no useful purpose can be served by [Rule 12(d)'s notice and opportunity requirement's] application where it is clear that the dispositive facts will remain undisputed and unchanged." *See Hollis v. U.S. Dep't of Army*, 856 F.2d 1541, 1544 (D.C. Cir. 1988).

C.     *Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56*

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See id.* at 248. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987); *see also Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). In addition, conclusory assertions offered without any factual basis for support do not satisfy an opponent's burden to set forth "affirmative evidence" showing a genuine issue for trial. *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham*, 813 F.2d at 1241).

### III. DISCUSSION

*A.    Federal Defendants' Motion to Dismiss Pursuant to Rule 12(b)(2)*

1.    <u>NBC Has Failed to Allege Facts Connecting Lilley with the District</u>

NBC has the burden of demonstrating that District of Columbia law grants this Court personal jurisdiction over Lilley. *Crane*, 894 F.2d at 456; *see also Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991) ("Even though subject-matter jurisdiction is

25

here predicated upon a federal question, [plaintiffs] must rely on D.C. law to sue nonresident defendants, since no federal long-arm statute applies."). For this Court to exercise personal jurisdiction over Lilley, NBC must plead facts sufficient to satisfy: (1) the District of Columbia's long-arm statute; and (2) the constitutional requirements of due process. See *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). The long-arm statute provides in pertinent part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's-
>
> > (1) transacting any business in the District of Columbia . . . .

D.C. Code § 13-423. NBC asserts that jurisdiction is proper under subsection (a)(1) because "it is reasonable for NBC to aver HUD and [Lilley] remained in continuous contact (via email correspondences and telephone calls) regarding the foreclosure proceeding." Pl.'s Opp'n at 37. This contact, NBC avers, must have been directed into the District as HUD is a federal agency headquartered in the District. *Id.* NBC does not allege that any other contact with the District or subsection of the long-arm statute confers personal jurisdiction over Lilley. *See* Pl.'s Opp'n at 37-39.[17]

In contrast to NBC's allegations, Lilley declares that his appointment as Fortner Manor's foreclosure commissioner was effectuated exclusively by HUD's Fort Worth, Texas office and

---

[17] The Court notes that NBC's opposition contains a heading entitled "The Now Known Facts Establish the Existence of General Jurisdiction" and a recitation of the standard for exercising general personal jurisdiction under D.C. Code § 13-334(a). *See* Pl.'s Opp'n at 38 (emphasis in the original). However, NBC conflates the distinct doctrines of specific personal jurisdiction under D.C. Code § 13-423(a)(1) and general personal jurisdiction under D.C. Code § 13-334(a). Furthermore, D.C. Code § 13-334(a) applies only to corporations, and Lilley is not a corporation. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002) (citing *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 850 (D.C. 1981)).

"[a]t no point did [he] communicate in any respect with any HUD official located in Washington, D.C., as part of the process by which [he] was appointed foreclosure commissioner." Second Lilley Decl. ¶ 4; *see also id.* ¶ 5 ("At no point during the course of my duties as foreclosure commissioner have I ever initiated any form of written, telephonic, or other contact with any HUD official located in Washington, D.C."). In light of Lilley's uncontroverted declaration and NBC's unsubstantiated speculation, the Court concludes that NBC has failed to establish specific facts connecting Lilley with the District. *See Ameritech Corp.*, 21 F. Supp. 2d at 36 ("The plaintiff . . . cannot rest on bare allegations or conclusory statements and must allege specific facts connecting each defendant with the forum."). Accordingly, the Court may not exercise personal jurisdiction over Lilley pursuant to subsection (a)(1) of the long-arm statute.

2.      The Jurisdictional Facts Are Not Intertwined with the Merits

NBC contends that the Court should at least delay resolving whether it has personal jurisdiction over Lilley because this jurisdictional issue is intertwined with the merits of this case. Pl.'s Opp'n at 39. Specifically, NBC contends that Lilley's possible communications with the District "would also likely disclose the details surrounding NBC's claims . . . ." *Id.* at 40. As However, as this Court stated when rejecting NBC's identical argument in opposition to Hotard's motion to dismiss for lack of personal jurisdiction:

> [W]hether this Court has personal jurisdiction over [Lilley] is not intertwined, much less inextricably, with the merits of this case. Regardless of whether Fortner Manor's foreclosure complied with the APA and HUD procedures, the nature of [Lilley's] contacts with the District of Columbia will remain unaffected. The fact that the same evidence may both support [NBC's] claims and indicate [Lilley's] contact with HUD, does not render the merits of this case inextricably intertwined with the personal jurisdiction issue currently before the Court.

*See* [36] Mem. Op. at 7.  Accordingly, the Court shall not defer resolution of Federal Defendants'

motion to dismiss Lilley as a defendant for lack of personal jurisdiction.

### 3.      NBC Is Not Entitled to Jurisdictional Discovery

Finally, NBC attempts to evade the motion to dismiss Lilley as a defendant for lack of

personal jurisdiction by claiming that it "is entitled, at bare minimum, to full discovery with

respect to the jurisdictional issue raised."  Pl.'s Opp'n at 40.

"It is well established that the 'district court has broad discretion in its resolution of

[jurisdictional] discovery problems.' "  *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087,

1093 (D.C. Cir. 2008) (quoting *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir.

1983)).  "This Circuit's standard for permitting jurisdictional discovery is quite liberal."

*Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003).  "[H]owever,

in order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such

discovery will enable it to show that the court has personal jurisdiction over the defendant."

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)

(denying jurisdictional discovery when plaintiff "did not allege any facts remotely suggesting that

[the defendant] had any connection to the District of Columbia").  Moreover, "a plaintiff must

make a 'detailed showing of what discovery it wishes to conduct or what results it thinks such

discovery would produce.' "  *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 53 (D.D.C.

2003) (quoting *Philip Morris*, 116 F. Supp. 2d at 130 n.16).  "Where there is no showing of how

jurisdictional discovery would help plaintiff discover anything new, 'it [is] inappropriate to

subject [defendants] to the burden and expense of discovery.' "  *Id.* (quoting *COMSAT Corp. v.

Finshipyards S.A.M.*, 900 F. Supp. 515, 524 n. 4 (D.D.C. 1995)) (alterations in the original); *see*

*also FC Inv. Grp.*, 529 F.3d at 1093 ("[A] request for jurisdictional discovery cannot be based on mere conjecture or speculation.").

In this case, NBC requests jurisdictional discovery "to establish the known jurisdictional predicates with record evidence." Pl.'s Opp'n at 41. NBC asserted this identical boilerplate request for jurisdictional discovery when it opposed Hotard's motion to dismiss. The Court shall once again deny NBC's request for jurisdictional discovery. First, NBC's request does not amount to the necessary "detailed showing of what discovery [NBC] wishes to conduct or what results it thinks such discovery would produce." *Atlantigas Corp.*, 290 F. Supp. 2d at 53. Second, as mentioned above, NBC's basis for personal jurisdiction over Lilley is completely speculative, and therefore cannot serve as the basis for jurisdictional discovery. *See FC Inv. Grp.*, 529 F.3d at 1093 ("[A] request for jurisdictional discovery cannot be based on mere conjecture or speculation."). Contrary to NBC's suggestion, a request for jurisdictional discovery is not a talisman whose mere utterance can ward off an impending motion to dismiss for lack of personal jurisdiction. Rather, a plaintiff must at least have a good faith basis that jurisdictional discovery will reveal the existence of facts sufficient to establish personal jurisdiction over a defendant. *See Caribbean Broad. Sys.*, 148 F.3d at 1090. NBC has not provided the Court with a reason to believe that there is a good faith basis for seeking jurisdictional discovery. *See Bastin v. Fed. Nat'l Mortgage Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997) (affirming district court's denial of jurisdictional discovery where request "would amount to nothing more than a fishing expedition"). Therefore, the Court shall deny NBC's request for jurisdictional discovery. Accordingly, the Court shall grant Federal Defendants' motion to dismiss Lilley as a defendant for lack of personal jurisdiction.

B.      *The Secretary's Motion to Dismiss Pursuant to Rule 12(b)(6)*

Although the Court will treat the Secretary's[18] dispositive motion primarily as a motion

for summary judgment based on the parties' submission of materials outside the pleadings, there

are two discrete claims which do not rely on matters outside the pleadings.  These are NBC's

claims that (1) HUD discriminated against NBC at the request of other non-minority

organizations, *see* Compl. ¶ 77; and (2) HUD "singled out" NBC for foreclosure, *see id.* ¶ 79.

Therefore, the Court shall consider these claims to determine whether NBC has asserted a claim

upon which relief can be granted pursuant to Rule 12(b)(6).

1.      NBC Has Failed to State a Claim that HUD Discriminated Against It at
the Request of Non-Minority Profit or Non-Profit Organizations

As part of its claim that the Secretary acted arbitrarily or capriciously, NBC alleges that in

foreclosing on Fortner Manor, HUD "acted upon the request of other, non-minority profit or non-

profit organizations who desired to obtain [NBC's] valuable property" and that this was

"discriminatory."  Compl. ¶ 77.  The Secretary argues that this claim must be dismissed because

the Complaint fails to allege any facts that support this conclusory allegation or show that this

would constitute arbitrary or capricious action by the Secretary.  In its opposition, NBC fails to

address this claim and does not otherwise argue that HUD discriminated against NBC in this

manner.  Accordingly, the Court may treat the Secretary's arguments as conceded.  *See, e.g.*,

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003)

("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive

motion and addresses only certain arguments raised by the defendant, a court may treat those

arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir.

_____

[18] With the dismissal of Lilley, the Secretary is the only remaining defendant.

2004); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."). Moreover, even if the Court were not to treat these arguments as conceded, the Court would still dismiss this claim for failure to state a claim because the Complaint does not contain any factual allegations to support this claim.

        2.        <u>NBC Has Failed to State a Claim that HUD Singled It Out Foreclosure</u>

NBC also claims that the Secretary acted arbitrarily and capriciously by "singling out [Fortner Manor] for foreclosure in the midst of the disorganization of the federal government in dealing with the aftermath of Hurricane Katrina." Compl. ¶ 79. The Secretary moves to dismiss this claim on the ground that NBC has failed to plead any specific facts to support it. *See* Defs.' Mot. at 44. After reviewing the Complaint, the Court agrees. NBC does not allege in its Complaint that there were other similarly situated properties that HUD did not foreclose on or otherwise explain how NBC was "singled out" by HUD. NBC's conclusory allegation that HUD acted arbitrarily and capriciously by singling out NBC is insufficient to plausibly state a claim for relief. NBC does assert additional facts in its opposition that are arguably relevant to this claim, *see* Pl.'s Opp'n at 9, 25, but the Court may not consider such new allegations when deciding a motion to dismiss, which tests the sufficiency of the allegations in the Complaint. *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted). Moreover, the fact that HUD may have acted differently in other published cases involving foreclosure does not establish that it acted arbitrarily or capriciously in this instance. Therefore, for the aforementioned reasons, the Court concludes that NBC has

failed to state a claim that HUD singled it out for foreclosure or discriminated against it at the request of non-minority organizations.[19]

C.    *The Secretary's Motion for Summary Judgment*

The Court now considers the Secretary's motion for summary judgment.  NBC asserts four counts against the Secretary.  The Court shall first address Count I, which seeks a declaratory judgment that HUD failed to comply with its regulations requiring written notice justifying its refusal to delay or withdraw Fortner Manor's foreclosure.  The Court shall then analyze Counts II and III, which are NBC's challenges to HUD's foreclosure process and decision under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA").  Finally, the Court shall conclude with Count IV, wherein NBC seeks to permanently enjoin the Secretary from foreclosing Fortner Manor.

1.    Count I

In Count I, NBC claims that HUD violated its own regulations by failing to provide written notice justifying its refusal to delay or withdraw Fortner Manor's foreclosure and seeks a declaration that the July 28, 2009 and November 30, 2009 foreclosure sales and October 2009 Notice of Foreclosure are therefore illegal and void.  *See* Compl. ¶¶ 62-68.  The regulation at issue is 24 C.F.R. § 27.25(d), which states: "If upon application by the mortgagor, the [foreclosure] commissioner refuses to withdraw the property from foreclosure under section

_____

[19] NBC argues that discovery will enable it to obtain more information regarding possible examples of how HUD singled it out for foreclosure.  *See* Pl.'s Opp'n at 9 n.2, 19, 25 n.5.  However, having failed to state such a claim, NBC is not entitled to this discovery.  *See, e.g.*, *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) ("[T]here is no general right to discovery upon filing of the complaint.  The very purpose of Fed. R. Civ. P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery.") (internal quotation marks and citation omitted).

369A(a) of the Act (12 U.S.C. 3709(a)), the commissioner shall provide the mortgagor and the Secretary with a written statement of the reasons for the refusal." In turn, 12 U.S.C. § 3709(a) provides in pertinent part that:

> [T]he foreclosure commissioner shall withdraw the security property from foreclosure and cancel the foreclosure sale only if-
> . . .
> (2) the commissioner finds, upon application of the mortgagor *at least three days prior to the date of sale*, that the default or defaults upon which the foreclosure is based did not exist at the time of service of the notice of default and foreclosure sale . . . .

(emphasis added).

The Secretary contends that HUD did not violate 24 C.F.R. § 27.25(d) because the foreclosure commissioner never received a timely application from NBC to withdraw the property from foreclosure. NBC counters that its counsel attempted to contact Lilley on July 27 and 28, 2009 but did not receive a prompt response.[20] *See* Pl.'s Opp'n at 32 (citing Weinstein Decl. ¶¶ 5-6). Even assuming, *arguendo*, that the attempts by NBC's counsel to contact Lilley amounted to an "application" under 24 C.F.R. § 27.25(d), these attempts occurred the day before and the day of the foreclosure sale—July 28, 2009—and therefore were untimely. *See* Compl. ¶ 43; Defs.' Stmt. ¶ 92. Section 3709(a) required NBC to submit its application at least three days prior to the foreclosure sale—i.e., by July 25, 2009. The Secretary contends that an untimely application does not trigger 24 C.F.R. § 27.25(d)'s written response requirement. This

---

[20] NBC's opposition is not organized based on either the individual counts asserted against the Secretary, or the Secretary's motion, but with respect to separate instances where NBC contends the Secretary acted arbitrarily and capriciously. *See* Pl.'s Opp'n at 19-33. Although the Court has thoroughly reviewed NBC's opposition in an attempt to locate those arguments that respond to the arguments raised in the Secretary's motion, the Court notes that NBC's organizational scheme has unnecessarily complicated this task.

is a straightforward reading of the regulations, and NBC advances no legal authority or argument to contradict the plain language of the regulations. In fact, NBC does not even discuss or refer to 24 C.F.R. § 27.25(d) or 12 U.S.C. § 3709(a) in its opposition. Accordingly, the Court cannot conclude that HUD failed to comply with 24 C.F.R. § 27.25(d) and that the July 28, 2009 and November 30, 2009 foreclosure sales and October 2009 Notice of Foreclosure were contrary to the law as a result. Therefore, the Secretary is entitled to judgment as a matter of law with respect to Count I.[22]

        2.     <u>Counts II and III</u>

In Counts II and III of the Complaint, NBC claims that HUD violated the APA by, *inter alia*, failing to follow its own regulations, failing to afford NBC with due process prior to foreclosure, and deciding to foreclose on Fortner Manor amidst the federal government's disorganized response to Hurricane Katrina. The APA provides cause of action for federal courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). NBC, as the party challenging the agency action, must prove that HUD's decision was arbitrary or capricious. *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002). An agency's decision may be arbitrary and capricious if: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider

---

[22] NBC also claims that declaratory judgment in Count I is appropriate because the July 28, 2009 and November 30, 2009 foreclosure sales were ultimately unsuccessful. *See* Pl.'s Opp'n 33-34. NBC provides no authority for this proposition, *see id.*, and the Court concludes that the fact that the foreclosure sales did not result in a successful purchaser is irrelevant as to whether HUD failed to comply with or interpret its regulations.

an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Jicarilla Apache Nation v. U .S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010).

In assessing the merits of NBC's challenge, the Court begins with the presumption that HUD's action was valid. *Grid Radio v. Fed. Commc'ns Comm'n*, 278 F.3d 1314, 1322 (D.C. Cir. 2002). This standard of review is highly deferential; the Court need not find that HUD's decision is "the only reasonable one, or even that it is the result [the Court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983). That is, it is not enough for HUD's decision to be incorrect; so long as it has some rational basis, the court is bound to uphold the decision. *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 13 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Finally, in regard to HUD's actions in particular, HUD must "exercise [its] powers, functions, and duties . . . consistently with the national housing policy declared by" the national housing acts. *See* 42 U.S.C. § 1441. This mandate "is not precatory; HUD is obliged to follow these policies" and "[a]ction taken without consideration of them, or in conflict with them, will not stand." *Pennsylvania v. Lynn*, 501 F.2d 848, 855 (D.C. Cir. 1974). Nevertheless, "once a mortgagor defaults, '[t]he federal policy to protect the treasury and promote the security of federal investment . . . becomes predominant.'" *United States v. OCCI Co.*, 758 F.2d 1160, 1163 (D.C. Cir. 1985) (quoting *United States v. Victory Highway Vill., Inc.*, 662 F.2d 488, 494

(8th Cir. 1981)); *accord United States v. Stadium Apartments, Inc.*, 425 F.2d 358, 363 (9th Cir. 1970). The decision whether to foreclose "is fundamentally of a business and administrative nature, requiring the exercise of HUD's business and administrative judgment." *United States v. Winthrop Towers*, 628 F.2d 1028, 1036 (7th Cir. 1980); *see also Victory Highway Vill.*, 662 F.2d at 495 ("[HUD] has broad discretion to choose its possible remedies . . . and thereby achieve national housing objectives."). Although HUD's decision whether to foreclose is subject to judicial review under the APA, judicial review should not "afford the defaulting mortgagor an opportunity to unduly prolong the foreclosure proceedings." *See Winthrop Towers*, 628 F.2d at 1036.

HUD is entitled to summary judgment with respect to its decision to foreclose if NBC defaulted on the Mortgage Agreement, HUD is entitled to foreclose in light of NBC's default, and HUD's decision to foreclose was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See OCCI*, 758 F.2d 1160, 1162-63; *United States v. Wennick*, 645 F. Supp. 103, 105 (D. Del. 1986). The Court shall review the parties' allegations below with respect to each of these elements.

        a.       NBC Remains in Non-Monetary and Monetary Default and Therefore HUD Is Entitled to Foreclose on Fortner Manor

The Secretary contends that NBC has remained in non-monetary default with respect to Fortner Manor. *See* Defs.' Mot. at 31; Defs.' Reply at 16. The Court agrees. The August 2007 and November 2007 Violation Notices, as well as the March 2008 Default Notice, informed NBC that it was in violation of, *inter alia*, the Regulatory Agreement by failing to maintain

Fortner Manor in good repair and condition.[23]  Under the Regulatory Agreement, HUD may

declare a default if NBC does not correct a violation within thirty days of receiving HUD's notice

of violation.  *See id.* at 16 (Regulatory Agreement).  Even after the August 2007 and November

2007 Violation Notices, NBC did not cure its violations, and so HUD declared NBC in default of

the Regulatory Agreement in the March 2008 and December 2008 Default Notices.  *See id.* at 57-

58 (March 2008 Default Notice); *id.* at 61 (December 2008 Default Notice).

NBC disputes that it has failed to operate Fortner Manor in good repair and condition.

However, NBC argues only that "the damages caused by Hurricane Katrina could not have been

controlled by NBC" and that "all residents were evacuated safely and no one was hurt."  Pl.'s

Opp'n at 12.  These excuses do not establish that NBC was not in default.  As set forth in the

August 2007 and November 2007 Violation Notices, as well as the March 2008 Default Notice,

the standard for good repair and condition of Section 811 housing is set forth in 24 C.F.R.

§ 5.703.  *See* AR at 51 (August 2007 Violation Notice); *id.* at 55 (November 2007 Violation

Notice); *id.* at 57 (March 2008 Default Notice).  This standard does not discuss whether

occupants safely escaped a natural disaster; rather, it sets forth minimum requirements for the

physical condition of Section 811 housing.  *See* 24 C.F.R. § 5.703.  NBC provides no authority

for its claim that its noncompliance with the Regulatory Agreement may be excused because it

---

[23] The language employed in each notice is slightly different, however, the import of each is the same: NBC's failure to maintain Fortner Manor in good repair and condition violated the Regulatory Agreement.  *See* AR at 51 (August 2007 Violation Notice) (noting that NBC failed to maintain Fortner Manor "in good repair and condition"); *id.* at 55 (November 2007 Violation Notice) ("HUD has provided the Owner two years to return the property to good repair and condition.  To date, the Project has not become inhabitable . . . ."); *id.* at 57 (March 2008 Default Notice) (indicating that despite the August 2007 and November 2007 Violation Notices, a recent inspection revealed "that the Project remains uninhabitable due to substandard conditions, and the Owners are in default of their contractual obligations").

was caused by a natural disaster.  *See* Pl.'s Opp'n at 12.  In fact, as the Secretary notes, neither

the Regulatory Agreement nor the Mortgage Agreement contains a force majure clause or any

other provision that would excuse NBC's noncompliance with the Regulatory Agreement if

caused by a natural disaster.  *See* Defs.' Reply at 17.  In the absence of such a provision, the fact

that Hurricane Katrina caused Fortner Manor's damages does not prevent NBC from being in

default of the Regulatory Agreement and, consequently, the Mortgage Agreement.  *See* AR at 7

(Mortgage Agreement) (incorporating by reference the Regulatory Agreement's provisions).  For

these reasons, the Court concludes that NBC is in non-monetary default.

   The Secretary also contends that NBC remains in monetary default since HUD

accelerated NBC's capital advance—$1,535,700.00—in the December 2008 Default Notice.  *See*

Defs.' Mot. at 31-32; Defs.' Reply at 17-18.  NBC refutes this contention, arguing that it cannot

be in monetary default because it was never obligated to make monthly mortgage payments for

Fortner Manor.[24]  *See* Pl.'s Opp'n at 12, 30; *see also* Gable Decl., Ex. H (Letter from Reverend

Noble, Chairman, NBC, to Shaun Donovan, Sec'y, HUD (Jan. 12, 2009)), at 1 (disputing that

NBC was in monetary default because "Fortner Manor was funded thru [sic] a Section 811

Grant; therefore there is no monthly mortgage payment").  Although NBC is correct that it did

not have to make monthly mortgage payments, the Mortgage Agreement provides that "[u]pon

default under the Regulatory Agreement, the Mortgagee, at his/her option, may declare the whole

_____

[24] The source of this argument appears to be the December 2008 Default Notice, which provides that NBC is in violation of the Mortgage Agreement because NBC "*failed to make monthly mortgage payments* and failed to maintain and operate the property in a decent, safe and sanitary manner." AR at 61 (emphasis added). The Court notes that NBC does not claim that the notice's reference to a failure to pay monthly mortgage payments alone rendered HUD's foreclosure decision arbitrary or capricious or otherwise prejudiced NBC in any manner. *See* Pl.'s Opp'n at 12, 30.

indebtedness secured to be due and payable." AR at 7 (Mortgage Agreement); *see also* AR at 16 (Regulatory Agreement) (providing that upon default of the Regulatory Agreement, HUD may "[d]eclare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage"). Pursuant to the Mortgage Agreement, NBC was indebted to HUD for $1,535,700.00, which was secured by a mortgage in Fortner Manor. AR at 7. Prior to declaring this debt due in the December 2008 Default Notice, HUD warned NBC in the August 2007 and November 2007 Violation Notices that if NBC did not correct the noted violations, "the Secretary may, without further notice, declare the owner in default of the Regulatory Agreement and seek any and all available remedies, including but not limited to, acceleration of the outstanding principal indebtedness . . . ." AR at 52 (August 2007 Violation Notice); AR at 56 (November 2007 Violation Notice). In conclusion, NBC's claim that it is not in monetary default because it did not have to pay monthly mortgage payments is without merit. The Court concludes that, as of the parties' filings in this case, NBC has remained in non-monetary and monetary default.

It is clear from the record that HUD is entitled to foreclose on Fortner Manor under the terms of the Mortgage Agreement due to NBC's monetary and non-monetary default. *See* AR at 9 (Mortgage Agreement) ¶ 21. Therefore, NBC must "come forward and introduce, as an affirmative defense which would defeat HUD's foreclosure right, evidence that HUD's decision to foreclose was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *OCCI*, 758 F.2d at 1163 (quoting *Winthrop Towers*, 628 F.2d at 1036). NBC makes a series of allegations claiming that HUD acted arbitrarily, capriciously, or contrary to its own regulations when it decided to foreclose Fortner Manor. The Court shall address these arguments

below in the order in which they appear in NBC's Complaint.

>    b.    HUD's Notices Complied with Applicable Regulations

In Count II of its Complaint, NBC claims that it has been denied due process through HUD's refusal to halt or adjourn Fortner Manor's foreclosure without proper notice, an opportunity for a hearing, and adherence to HUD regulations.  *See* Compl. ¶¶ 70-74.[25]  In its Complaint, NBC alleges only that the May 2009 and October 2009 Notices of Foreclosure Sale did not adhere to HUD regulations.  *See* Compl. ¶ 55.  In its opposition, NBC also claims that the November 2007 Violation Notice and March 2008 and December 2008 Default Notices were improper.  *See* Pl.'s Opp'n at 11-12, 14-15.  The Secretary responds to NBC's arguments and does not argue that the Court should disregard NBC's claims with respect to these notices. *See* Defs.' Reply at 13-16.  Therefore, the Court shall address all of these arguments.

>    i.    HUD had no obligation to send the notices to the FDMBA.

NBC's first claim is that the March 2008 and December 2008 Default Notices, as well as the November 2007 Violation Notice, were improper because they were not sent to Fortner Manor's local sponsor—the FDMBA.  *See* Pl.'s Opp'n at 11-12.  NBC, however, provides no authority that HUD was required to send notices to the FDMBA.  In fact, as the Secretary points out, HUD's only statutory obligation was to send the March 2008 and December 2008 Default Notices to "the original mortgagor and all subsequent mortgagors of record or other persons who appear of record or in the mortgage agreement to be liable for part or all of the mortgage debt."

---

[25] Unlike the Secretary, *see* Defs.' Mot. at 40-42, the Court does not construe NBC's Complaint as asserting a claim that NBC was denied due process under the Fifth Amendment to the Constitution.  NBC does not mention the Fifth Amendment in its Complaint or discuss cases involving the Fifth Amendment in its opposition.  Accordingly, the Court construes NBC's due process claims as relating to the alleged denial of due process required under HUD's governing statutes and regulations.

12 U.S.C. § 3708(1)(B).  HUD satisfied this obligation by sending the March 2008 and

December 2008 Default Notices to Reverend Centrallo at 383 Washington Street, Newark, Ohio,

which is NBC's address in the Regulatory Agreement.  *See* AR at 13 (Regulatory Agreement); *id.*

at 57 (March 2008 Default Notice); *id.* at 61 (December 2008 Default Notice).[26]  The statute also

requires that notice be sent to the current security proper owner of record and all persons holding

liens of record, *see* 12 U.S.C. § 3708(1), but there is no evidence that FDMBA was either the

current owner or a lienholder of record.

As for the November 2007 Violation Notice, the Regulatory Agreement provides that if

NBC violated any of the Regulatory Agreement's provisions, "HUD *may* give written notice" to

NBC at the address provided in the Regulatory Agreement "or such other address as may

subsequently, upon written notice thereof to HUD, be designated by the Mortgagor as its legal

business address."  *Id.* at 16 (Regulatory Agreement) (emphasis added).  The November 2007

Notice cited NBC for a violation of the Regulatory Agreement and was sent to NBC's address in

the Regulatory Agreement.  *See id.* at 55 (November 2007 Violation Notice).  There is no

evidence that NBC changed its legal business address to the FDMBA so as to implicate HUD's

obligation under the Regulatory Agreement.

Additionally, NBC does not contend that it informed HUD that FDMBA was Fortner

Manor's "local sponsor" before Dr. Turner's April 29, 2009 letter.  AR at 64-65 (Letter from Dr.

Robert Turner, Sr., President, FDMBA, to Ruth Pompa, Dir., Fort Worth Multifamily Property

Disposition Ctr., HUD (Apr. 29, 2009)).  Accordingly, even assuming *arguendo* that Dr.

Turner's letter somehow obligated HUD to send future notices to the FDMBA, this obligation

---

[26] The Regulatory Agreement is incorporated by reference in the Mortgage Agreement.
*See* AR at 7 (Mortgage Agreement).

would have arisen only in July 2009—after HUD sent out the March 2008 and December 2008

Default Notices, as well as the November 2007 Violation Notice. *See* Defs.' Reply at 14-15.

Therefore, HUD's notices were not improper by virtue of the fact that they were not sent to the

FDMBA.

> ii. The November 2007 Violation Notice and March
> 2008 Default Notice are not improper simply because NBC
> disputes that Fortner Manor was secured.

NBC's second claim is that the November 2007 Violation Notice and March 2008

Default Notice were improper because NBC "disputes that the property was not secured at the

time" HUD sent the notices. Pl.'s Opp'n at 11. These notices, however, did not claim that

Fortner Manor was unsecured, but that Fortner Manor was "uninhabitable." Defs.' Reply at 15;

AR at 55 (November 2007 Violation Notice); *id.* at 57 (March 2008 Default Notice). NBC fails

to explain how disputing that Fortner Manor was unsecured causes these notices to be improper.

Consequently, the Court concludes that this dispute does not render the November 2007

Violation Notice or December 2008 Default Notice improper. *See City of Olmsted Falls*, 292

F.3d at 271 ("[T]he party challenging an agency's action as arbitrary and capricious bears the

burden of proof.").[27]

> iii. HUD sent the July 2009 Notice of Foreclosure to the
> appropriate entities.

NBC's third claim is that the July 2009 Notice of Foreclosure was improper because it

"was not sent to the individual at NBC with whom HUD and . . . Senator [Landrieu]'s office had

previously been communicating; and [it] was not sent to [Consoc] . . . despite Dr. Noble's letter

---

[27] The Court also rejects NBC's argument that the November 2007 Violation Notice and March 2008 Default Notice were improper because NBC had submitted information to HUD concerning its remediation plan. The Court addresses this claim below. *See infra* § III.C.2.iii.

to HUD of April 11, 2008." Pl.'s Opp'n at 14-15. NBC's arguments are without merit.

Significantly, HUD was statutorily obligated to send the July 2009 Notice of Foreclosure to "the original mortgagor and all subsequent mortgagors of record or other persons who appear of record or in the mortgage agreement to be liable for part or all of the mortgage debt." 12 U.S.C. § 3708(1)(B). HUD satisfied this obligation when it sent the notice by certified letter to Reverend Centrallo at 383 Washington Street, Newark, Ohio. *See* AR at 92 (Letter from Roy S. Lilley, to Reverend Centrallo, NBC (July 9, 2009)). NBC provides this Court with no authority indicating that HUD must exceed 12 U.S.C. § 3708's requirements by also sending the July 2009 Notice of Foreclosure to the last NBC representative who communicated with HUD or to Consoc. Moreover, even assuming, *arguendo*, that HUD would be obligated to provide notices to entities other than those provided in 12 U.S.C. § 3708(1) if requested to do so by NBC, Reverend Noble's April 11, 2008 letter to HUD does not actually request that Consoc receive all future communications on NBC's behalf. Rather, it provides that "NBC encountered administrative difficulties resulting from inappropriate representations by firms claimed [sic] to have been representing NBC," and therefore only Consoc "is authorized to represent projects sponsored/controlled by NBC in your jurisdiction." AR at 59. Accordingly, the Court rejects NBC's argument that the July 2009 Notice of Foreclosure was improper.

        iv.    The December 2008 Default Notice did not prevent NBC from offering HUD reasons to halt Fortner Manor's foreclosure.

NBC's final argument is that the December 2008 Default Notice limited the reasons that NBC could offer HUD to halt Fortner Manor's foreclosure to only "legal" reasons and that this limitation violated HUD regulations. *See* Pl.'s Opp'n at 29-30. The Secretary disagrees, arguing

that NBC's premise is flawed because the December 2008 Default Notice did not limit NBC to offering only legal reasons to halt Fortner Manor's foreclosure.  *See* Defs.' Reply at 11-12.  For the reasons set forth below, the Court agrees with the Secretary.

The plain language of the December 2008 Default Notice places no limitations on the type of reasons that NBC could provide to HUD to halt Fortner Manor's foreclosure.  The December 2008 Notice provides in pertinent part that:

> Before instituting foreclosure proceedings, however, HUD will provide you with an opportunity to show reasons why foreclosure should not take place.  If you believe that no default exists, or if you know of some other legal reason that HUD should not foreclose, these reasons should be submitted, in writing, within twenty-one (21) days of the receipt of this letter.

AR at 61.  Essentially, NBC's position is that the qualifier "legal" before "reason" means that NBC "can only submit a *legal* reason why foreclosure should be halted."  Pl.'s Opp'n at 29 (emphasis in the original).  However, this position ignores the notice's preceding sentence, which states without qualification that "HUD will provide you with an opportunity to show *reasons* why foreclosure should not take place."  AR at 61 (emphasis added).  Additionally, the words immediately surrounding the phrase "legal reason" also belie NBC's position that it could only offer legal reasons: "*or some other* legal reason."  AR at 61 (emphasis added).  For the aforementioned reasons, the Court concludes that the December 2008 Default Notice did not preclude NBC from presenting nonlegal reasons to stop Fortner Manor's foreclosure.  Therefore, the Court need not determine whether a notice that did preclude a mortgagor from advancing nonlegal reasons would violate 24 C.F.R. § 27.5.

Nonetheless, even assuming *arguendo* that the December 2008 Default Notice violated 24 C.F.R. § 27.5, the Court would still not vacate HUD's decision to foreclose Fortner Manor on

this basis because NBC has failed to argue that this error was prejudicial. *See PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). NBC does not explain how the December 2008 Default Notice's use of the phrase "legal reason" actually influenced the reasons it presented to HUD in favor of halting Fortner Manor's foreclosure. In fact, NBC's actions after the December 2008 Default Notice demonstrate that the phrase did not actually impact NBC. On January 12, 2009, Reverend Noble sent a letter to the Secretary in which he indicated that he had reviewed the December 2008 Default Notice and requested that the Secretary consider halting the foreclosure of Fortner Manor for, *inter alia*, the following reasons: (1) the December 2008 Default Notice's erroneous reference to failure to pay monthly mortgage payments; (2) NBC's efforts after Hurricane Katrina to obtain reconstruction funding; (3) how halting the foreclosure of Fortner Manor would allegedly advance HUD's goals; and (4) how HUD's guidelines and procedures were not created in anticipation of a natural disaster like Hurricane Katrina. Gable Decl., Ex. H (Letter from Reverend Noble, Chairman, NBC, to Shaun Donovan, Sec'y, HUD (Jan. 12, 2009)), at 1-3. Because Reverend Noble's arguments are not limited to just "legal reasons," the Court does not perceive how the December 2008 Default Notice actually prejudiced NBC by preventing it from presenting nonlegal reasons to halt Fortner Manor's foreclosure. Accordingly, the Court rejects NBC's claims that the December 2008 Default Notice, or any other notice, was improper.

### c. Count III

In Count III of its Complaint, NBC claims HUD acted arbitrarily and capriciously and abused its discretion by (1) foreclosing on Fortner Manor despite the national housing policies

implemented after Hurricane Katrina, *see* Pl.'s Opp'n at 21-24; (2) foreclosing on Fortner Manor despite the known disorganization of federal agencies after Hurricane Katrina and accompanying delays, *see* Compl. ¶ 79; Pl.'s Opp'n at 25-28; and (3) failing to consider all the evidence presented to HUD regarding NBC's financing and rebuilding efforts, *see* Compl. ¶ 77; Pl.'s Opp'n at 9-10, 24, 28-33.[28]  The Court shall review each of these claims below.

        i.        HUD's decision to foreclose Fortner Manor did not violate national housing policies.

NBC argues that HUD's decision to foreclose on Fortner Manor was arbitrary and capacious because several contemporaneous Congressional statutes and a state administrative plan stressed the importance of maintaining affordable rental housing, including Section 811 housing, in areas affected by Hurricane Katrina.  *See* Pl.'s Opp'n at 21-25.  In particular, NBC relies upon: (1) the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery ("Hurricane Recovery Act"), Pub. L. No. 109-234, 120 Stat. 418 (2006); (2) the Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, 2006 ("DOD Appropriations Act"), Pub. L. No. 109-148, 119 Stat. 2680 (2005); (3) the Louisiana Recovery Authority Action Plan Amendment ("Action Plan"); and (4) the Department of Homeland Security Appropriations Act, 2007 ("DHS Appropriations Act"), Pub. L. No. 109-295, 120 Stat. 1355 (2007).  *See* Pl.'s Opp'n 21-24.  The Secretary disputes that any of the aforementioned sources altered HUD's preexisting obligation to "preserve the assets of the insurance fund so that more projects may be

---

      [28] NBC also claimed in Count III that HUD acted arbitrarily and capriciously by (1) discriminating against NBC at the request of non-minority profit or non-profit organizations; and (2) singling NBC out for foreclosure. *See* Compl. ¶¶ 77, 79.  As the Court explained in § III.B above, the Court has already dismissed these claims for failure to state a claim, and therefore shall not address them here.

insured in the future' and to 'protect public money from unnecessary risk." *OCCI*, 758 F.2d at

1165. For the reasons set forth below, the Court concludes that the aforementioned sources did

not render HUD's foreclosure decision arbitrary or capricious.

First, as the Secretary notes, Defs.' Reply at 19, this Court reviews HUD's foreclosure

decisions for consistency with the national housing policies that are enunciated in the national

housing acts, including 42 U.S.C. § 1441, *see, e.g.*, *OCCI*, 758 F.3d at 1162 ("HUD must

exercise its powers consistent with national housing policy as embodied in 42 U.S.C. § 1441

. . . ."). In this case in particular, HUD's decision to foreclose Fortner Manor must be consistent

with, *inter alia*, Section 811's purpose of:

> Enabl[ing] persons with disabilities to live with dignity and independence within
> their communities by expanding the supply of supportive housing that . . . (1) is
> designed to accommodate the special needs of such persons; and (2) provides
> supportive services that address the individual health, mental health, and other needs
> of such persons . . . .

42 U.S.C. § 8013(a). The Secretary argues that his decision to foreclose on Fortner Manor is

consistent with national housing policies for two reasons. *See* Defs.' Mot. at 46. First, the record

indicates that Fortner Manor was a vacant and blighted property for almost five years, and this

frustrated the national housing policy of eliminating substandard and inadequate housing for low-

income individuals. Second, after working with NBC for several years to redevelop Fortner

Manor unsuccessfully, HUD determined that the new ownership of Fortner Manor was required

to expeditiously return the property to use for the disabled and elderly population of New

Orleans. Given HUD's broad discretion in advancing national housing policies and the fact that

NBC is in default, the Court cannot conclude that HUD's foreclosure decision was arbitrary or

capricious in light of the national housing policies. *See Victory Highway Vill.*, 662 F.2d at 495

(HUD "has broad discretion to choose its possible remedies . . . and thereby achieve national housing objectives").

NBC provides no authority to support its unstated presumption that HUD's foreclosure decisions are arbitrary or capricious if they are inconsistent with Congressional or state policies other than the aforementioned national housing acts. On this basis alone, the Court rejects NBC's argument that HUD acted contrary to national housing policies because NBC fails to evaluate HUD's foreclosure decision under the relevant national housing policies.

Even assuming *arguendo* that the sources relied upon by NBC are relevant in determining whether HUD's foreclosure decision was consistent with national housing policies, the Court cannot agree with NBC that HUD acted arbitrarily or capriciously in light of the actions taken after Hurricane Katrina. First, NBC relies upon the Hurricane Recovery Act's grant of $5.2 billion "for repair, rehabilitation, and reconstruction . . . of the affordable rental housing stock (including public and other HUD-assisted housing) in the impacted areas." *See* 120 Stat. at 472. The Act also provides that HUD "may waive, or specify alternative requirements for, any provision of any statute or regulation that the Secretary administers in connection with the obligation by the Secretary or the use by the recipient of these funds or guarantees . . . ." *Id.* at 472-73. NBC argues that the Hurricane Recovery Act conveyed Congress's intent that Section 811 housing be preserved. However, the Hurricane Recovery Act did not alter HUD's mandate; it reinforces HUD's discretion. Furthermore, HUD's decision to foreclose on Fortner Manor is consistent with the Act's purpose of increasing the amount of affordable rental housing because HUD concluded that another owner could restore Fortner Manor more expeditiously. Therefore, the Court finds that the Hurricane Recovery Act does not render HUD's decision to foreclose on

Fortner Manor arbitrary or capricious.

Second, NBC relies upon the DOD Appropriations Act, and particularly the Act's following language: "To the extent feasible the Secretary of Housing and Urban Development shall preserve all housing within the area declared a major disaster . . . resulting from Hurricane Katrina or Rita that received project-based assistance under . . . section . . . 811 of the Cranston-Gonzalez National Affordable Housing Act . . . ." 119 Stat. at 2781. According to NBC, foreclosing on Fortner Manor was arbitrary or capricious because it failed to "preserve" Section 811 housing, and therefore violated the DOD Appropriations Act. *See* Pl.'s Opp'n at 22-23. The Court disagrees. In light of NBC's delays in redeveloping Fortner Manor and lack of funding, it was reasonable for HUD to conclude that foreclosing Fortner Manor and permitting the successful bidder to operate the property as low income housing would be the best method for preserving Fortner Manor. *See* AR at 79 (May 2009 Notice of Foreclosure) (providing that the successful bidder on Fortner Manor "will, pursuant to 12 U.S.C. 3706(b)(2)(A), be required to operate the Project in accordance with . . . 12 U.S.C. sec. 1715*l*").

Third, NBC relies upon the Action Plan, which purportedly indicates that the replacement of damaged rental housing is imperative to Louisiana's economic recovery in the wake of Hurricane Katrina. *See* Pl.'s Opp'n at 22-23. Neither party provided the Court with a copy of, or a citation to, the Action Plan, and therefore the Court cannot review this documents. Because NBC bears the burden of proving that HUD's actions were arbitrary and capricious, the Court shall reject NBC's claim that HUD's decision to foreclose was arbitrary or capricious based on the Action Plan.

Finally, NBC relies upon: (1) the DHS Appropriations Act's mandate that FEMA prepare

a National Disaster Housing Strategy ("Strategy"); (2) Congress' requirement that the Strategy "describe plans for promoting the repair or rehabilitation of existing housing;" 6 U.S.C. § 772(b)(7); and (3) the fact that FEMA was allegedly late in completing the Strategy, *see* Pl.'s Opp'n at 23-24.  The Strategy, according to NBC, evidences Congress' acknowledgment of the importance of rehabilitating rental housing in the aftermath of Hurricane Katrina.  *Id.*  However, NBC neither cites to, nor argues that, any provision of the DHS Appropriations Act pertains to HUD.  Accordingly, this argument fails for the same reasons as NBC's previous arguments: the DHS Appropriations Act did not preclude HUD from foreclosing on defaulted properties.

In conclusion, the Court finds that NBC has failed to establish that HUD's decision to foreclose Fortner Manor was arbitrary or capricious in light of the relevant national housing policies in effect before or after Hurricane Katrina.

ii.     HUD's decision to foreclose was not arbitrary or capricious in light of the alleged disorganization of federal agencies after Hurricane Katrina.

NBC also claims that HUD acted arbitrarily and capriciously in deciding to foreclose on Fortner Manor because of: (1) known "bureaucratic roadblocks;" (2) criticisms regarding FEMA's handling of recovery efforts after Hurricane Katrina; (3) and the allegedly "tempestuous" relationship between FEMA and HUD.  *See* Pl.'s Opp'n at 25-27.  NBC then argues that HUD's decision to declare NBC in violation of the Regulatory Agreement in August 2007—two years after Hurricane Katrina—was unreasonable because the Strategy indicates that homes damaged by a disaster "often require more than 2 years to repair or rebuild."  *See* FEMA, National Disaster Housing Strategy ("Strategy") 71 (Jan. 16, 2009), *available at*

http://www.fema.gov/pdf/emergency/disasterhousing/NDHS-core.pdf). For the reasons set forth below, the Court finds NBC's arguments to be without merit.

First, although HUD issued NBC's first violation notice in August 2007, HUD did not actually declare NBC in default until March 2008, more than two and a half years after Hurricane Katrina, AR at 61-62 (March 2008 Default Notice), and did not schedule a foreclosure sale until July 8, 2009, nearly four years after Hurricane Katrina, *id.* at 79-80 (May 2009 Notice of Foreclosure Sale). Regardless of the Strategy's relevancy to HUD's foreclosure decision, the Court cannot find that HUD's decision to hold a foreclosure sale nearly four years after Hurricane Katrina is arbitrary or capricious simply because the Strategy indicates that housing damaged in a natural disaster generally takes more than two years to rebuild. *See* Strategy at 71.

Second and more importantly, the logic behind NBC's argument reveals that its position is untenable. Although framed in terms of administrative difficulties, NBC essentially asks this Court for a defense to Fortner Manor's foreclosure because Hurricane Katrina damaged Fortner Manor. The Court cannot conclude that HUD's decision to hold a foreclose sale of Fortner Manor nearly four years after Hurricane Katrina was arbitrary or capricious. To do so would require this Court to grant NBC a perpetual defense to foreclosure because there is no limiting principle to NBC's argument—i.e., NBC presents no period of time after which Hurricane Katrina would no longer excuse its noncompliance with its contractual obligations. *See* Pl.'s Opp'n at 25-27.

As of the time the parties filed their briefs with the Court, NBC remains in default of the Mortgage Agreement and, as such, HUD "has broad discretion to choose its possible remedies . . . and thereby achieve national housing objectives." *Victory Highway Vill.*, 662 F.2d at 495.

51

Although "[t]he prompt enforcement of the rights of the United States through HUD to a foreclosure and sale . . . are consistent with national housing policy," *id.*, in this case, HUD waited, choosing instead to enforce its rights through a foreclosure sale nearly four years after Hurricane Katrina. Throughout this period of time, as well as in its filings to this Court to date, NBC has never claimed that it had complied with the Regulatory Agreement or that it could cure its non-monetary and monetary defaults pursuant to 12 U.S.C. § 3709(a)(3), thereby saving Fortner Manor from foreclosure. In conclusion, the Court cannot find HUD's decision to hold a foreclosure sale for Fortner Manor, nearly four years after Hurricane Katrina, was arbitrary or capricious due to "bureaucratic roadblocks," criticisms regarding FEMA's handing of Hurricane Katrina, and the allegedly "tempestuous" relationship between FEMA and HUD.

> iii.     HUD's foreclosure decision was not arbitrary or capricious because of an alleged failure to consider all the information NBC and others presented to HUD.

NBC's chief complaint is that HUD failed to consider all of the information NBC and others submitted regarding NBC's financing and restoration plans for Fortner Manor. *See* Pl.'s Opp'n at 9-10, 24, 28-33. This failure, NBC avers, rendered HUD's decision to foreclose arbitrary and capricious. *See id.* at 28-33. To be clear, NBC does not claim that this information demonstrated that NBC was not in default or that, despite NBC's default, the Mortgage Agreement forbade HUD from foreclosing on Fortner Manor. Rather, NBC appears to claim that HUD's decision to proceed with the foreclosure was arbitrary and capricious because this information should have been sufficient to meet HUD's request for a restoration plan. This argument is unconvincing for several reasons.

52

An agency's decision is arbitrary or capricious if: (i) it is counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  In March 2008, over two and a half years after Hurricane Katrina, HUD first declared NBC in default because Fortner Manor "remain[ed] uninhabitable due to substandard conditions."  AR at 57.  Even assuming that NBC met HUD's requirements for a restoration plan, NBC has never indicated that it has the funding necessary to implement a restoration plan. Notably, even ten months after the March 2008 Default Notice, Reverend Noble indicated to HUD that NBC still did not have the funds necessary to restore Fortner Manor.  Pl.'s Opp'n, Rev. Gable Decl., Ex. H (Letter from Reverend Noble, Chairman, NBC, to Shaun Donovan, Sec'y, HUD (Jan. 12, 2009)), at 1.  NBC points to no authority that requires HUD to allow Fortner Manor to languish in disrepair for years while NBC attempts to procure funding to restore Fortner Manor and thereby meet its contractual obligations.  NBC cannot reasonably claim that HUD had a contractual, statutory, or regulatory obligation to accept NBC's restoration plan in lieu of declaring NBC in default.  Therefore, HUD's decision to declare NBC in default was not arbitrary or capricious even assuming NBC filed an adequate restoration plan.

After HUD declared NBC in default in the March 2008 Default Notice, "[t]he federal policy to protect the treasury and promote the security of federal investment . . . [became] predominant."  *OCCI*, 758 F.2d at 1163 (citation omitted).  NBC suggests that HUD had an obligation to halt the foreclosure because NBC and others requested that it do so and HUD

appeared to be willing to defer foreclosures if mortgagors submitted recovery plans. However, these are equitable grounds for halting foreclosure, and "[e]quitable grounds . . . are not a defense to mortgage foreclosure by HUD once default occurs . . . ." *Id.* at 1165. Additionally, even assuming that NBC received funds from FEMA in July 2009 as it claims, *see* Pl.'s Opp'n at 25 (citing Gable Decl. ¶ 69), NBC was already in default at this time, and therefore HUD's decision to proceed with the foreclosure despite this promised funding is a wholly discretionary business judgment, *see OCCI*, 758 F.2d at 1165 ("[A]ny further business judgments made by HUD in its continued prosecution of the foreclosure action are immaterial and collateral to HUD's decision to foreclose and, therefore, wholly discretionary."). Therefore, the Court is also unable to find that HUD's decision to foreclose on Fortner Manor once NBC was in default was arbitrary or capricious due to a failure to consider the information NBC submitted.

For the aforementioned reasons, the Court concludes that HUD's decision to foreclose on Fortner Manor did not violate the APA, and therefore the Secretary is entitled to summary judgment with respect to Counts II and III.

3.    Count IV

In Count IV, NBC seeks a permanent injunction enjoining the Secretary from selling Fortner Manor pursuant to a non-judicial foreclosure. Compl. ¶¶ 82-88; *see also id.* at 17-18 (requesting relief for Count IV).[29]   In determining whether a permanent injunction is appropriate, courts consider the following factors: (1) the plaintiff's success on the merits; (2) whether the

_____

[29] Although NBC's Complaint requests relief in the form of a preliminary hearing, Compl. at 17, NBC has not applied for a preliminary injunction "in a document separate from the complaint," LCvR 65.1(c), nor moved for a hearing on the preliminary injunction, LCvR 65.1(d).

plaintiff will suffer irreparable injury absent an injunction; (3) whether, balancing the hardships, there is harm to the defendants or other interested parties; and (4) the public interest supports granting the requested injunction. *Hi-Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 13, 17 (D.D.C. 2008) (citing *Nichols v. Truscott*, 424 F. Supp. 2d 124, 143 (D.D.C. 2006)). Because NBC has not succeeded on the merits of its claims, it is not entitled to permanent injunctive relief. Accordingly, the Court shall grant the Secretary's motion for summary judgment with respect to Count IV.

## IV. CONCLUSION

For the foregoing reasons, the Court shall GRANT Federal Defendants' [21] Motion to Dismiss the Complaint, or, Alternatively for Summary Judgment and DENY Plaintiff's construed motion for jurisdictional discovery. Specifically, the Court shall GRANT Federal Defendants' motion to dismiss Lilley as a defendant for lack of personal jurisdiction. Additionally, the Court shall GRANT the Secretary's motion to dismiss NBC's claims that HUD discriminated against NBC at the request of non-minority organizations and singled out NBC for foreclosure. The Court shall GRANT the Secretary's alternative motion for summary judgment as to NBC's remaining claims. An appropriate order accompanies this Memorandum Opinion.


Date: March 31, 2011

                                    _____/s/_____
                                    **COLLEEN KOLLAR-KOTELLY**
                                    United States District Judge